## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Strategic Venue Partners, LLC,

<em>Plaintiff</em>,

Civil Action No.

v.

Darlene Braunschweig, Resolution Wireless LLC
and Suncoast Power LLC,

<em>Defendants</em>.

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Strategic Venue Partners, LLC ("SVP" or "Plaintiff"), by and through its undersigned counsel, brings this civil action against Darlene Braunschweig ("Braunschweig"), Suncoast Power LLC ("Suncoast Power") and Resolution Wireless LLC ("Resolution Wireless") (collectively, "Defendants") and respectfully states as follows:

### I.    INTRODUCTION

1.      This is an action to enjoin SVP's former Senior Vice President and Chief Business Development Officer, Braunschweig, and the two entities (Resolution Wireless and Suncoast Power) which she surreptitiously owned, operated and used to compete against SVP while she was employed by SVP and continues to be involved with to this day.

2.      Braunschweig's involvement in these businesses was and is a direct violation of the terms of her Employment Agreement which specifically prohibits both outside employment and ownership and involvement in competitive enterprises.  Braunschweig's Employment Agreement also prohibits Braunschweig from disclosing or using SVP's confidential and trade secret information outside of her employment with SVP.  Braunschweig violated these obligations as

well when she used SVP's proprietary information to further her personal interests, including but not limited to through her interest in Resolution Wireless and Suncoast Power, in competition with SVP.

3.      SVP terminated Braunschweig's employment for cause on July 20, 2023 due to her flagrant breach of her contractual obligations to SVP.

4.      Under the terms of her Employment Agreement, Braunschweig's non-competition obligations extend for at least six months from the date of her termination.

5.      At the time of her termination and for four weeks thereafter, SVP provided Braunschweig an opportunity to cease her competitive activities.  Braunschweig declined this opportunity and has refused to remedy her ongoing breach of obligations to SVP.

6.      SVP brings this action to enjoin Braunschweig, Resolution Wireless and Suncoast Power from further exploiting its goodwill, customer relationships, and confidential and proprietary information, in violation of federal and state law, and to remedy past and ongoing breaches.

## II.   THE PARTIES

7.      SVP is a wireless communication service provider and is a limited liability company formed under the laws of Delaware with its principal place of business at 35 Mason Street, 4th Floor Greenwich, CT.

8.      Braunschweig is SVP's former Chief Business Development Officer.  Upon information and belief, she resides in Zephyrhills, Florida.

9.      Resolution Wireless LLC is a wireless communication service provider and is a limited liability company formed under the laws of Florida with its principal place of business at 4786 NE 11th Ave, Oakland Park, Fl 33334.  As of the date of this filing, the Florida Division of Corporations lists Braunschweig as a manager of Resolution Wireless.

2

10.     Suncoast Power LLC is a commercial electric contractor which specializes in installing the infrastructure necessary to provide wireless services and is a limited liability company formed under the laws of Florida with its principal place of business at 6375 Harney Rd. Suite 102 Tampa, FL 33610.

### III.     JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over SVP's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue in the United States District Court for the Southern District of Florida is proper under 28 U.S.C. § 1391(b)(2), as the events giving rise to the claims in this action occurred in this District.  In particular, Resolution Wireless, one of the competitive enterprises is located in this District.  Further, under the Employment Agreement, SVP and Braunschweig agreed that venue properly lies in any court in Florida.

### IV.     FACTUAL BACKGROUND

**A.  SVP's Business**

13.     SVP was established in March 2017 to identify and develop North American wireless infrastructure projects and provide wireless infrastructure as a managed service.

14.     SVP provides a comprehensive suite of wireless infrastructure offerings for public and private enterprises spanning the healthcare, education, hospitality, retail, commercial mixed use, offices and multi-family sectors who wish to enhance the wireless connectivity of their buildings, including by having SVP make a capital investment in the wireless connectivity of buildings and allowing the building to pay for the service as an operating expense.

15.     In particular, SVP offers to provide the financing, design, building, ownership and operation of cellular distributed antenna systems ("DAS"), public safety distributed antenna systems, small cells and other similar in-building wireless communication assets (the "Wireless

Infrastructure").  These Wireless Infrastructure systems are what allow individuals to use high volumes of data on cellular networks within buildings when such usage could not be supported by the macro network infrastructure already put in place by the cellular carriers.  In addition, this Wireless Infrastructure is what enables public safety providers (such as fire and police services) to communicate in buildings where it may be otherwise challenging for them to do so.  Indeed, SVP has a standalone offering to provide infrastructure to ensure that public safety providers can communicate within one's property.  SVP also provides a service to building owners where it will market and manage the placement of cellular equipment on a building's rooftop in exchange for a portion of the payment from the cellular carrier to the building.

16.     SVP provides its services on a national basis and has developed Wireless Infrastructure in California, Connecticut, Illinois, Indiana, Maryland, Minnesota, New York, New Jersey, Nevada, Texas, and Washington.

17.     In establishing a comprehensive suite of offerings to build, manage and finance Wireless Infrastructure for customers, SVP has devoted a tremendous amount of resources to develop confidential and proprietary information related to the services offered ("Confidential Information").  This Confidential Information includes, but is not limited to, all customer, supplier, and vendor lists, budget information, contents of any database, contracts, product recipes, designs, technical know-how, pricing and cost information, performance standards, business plans, proprietary data, projections, market research, strategic plans, marketing information, financial information, financial models, system upgrade forecasts, sales information, training manuals, employee lists, and other competitively sensitive information.   Access to this Confidential Information is provided only on a need to know basis.

18.     A subset of this Confidential Information constitutes SVP's trade secrets which give SVP a key advantage in the marketplace over a fast-growing set of competitors.  SVP uses these trade secrets throughout the nationwide market it serves for Wireless Infrastructure.  SVP was only able to develop the below trade secrets through the devotion of thousands of hours of work in the Wireless Infrastructure space and the expenditure of hundreds of thousands of dollars.

19.     SVP protects these trade secrets by requiring any SVP employees, clients or contractors who have access to SVP's Confidential Information to execute confidentiality agreements in order to protect SVP's rights.  Employees are also expressly obligated to return all SVP materials upon the conclusion of their employment pursuant to the terms of SVP's Employee Handbook.

20.     SVP further seeks to preserve the integrity and confidentiality of its data and trade secrets by maintaining physical security of its premises and physical and electronic security of its information technology system.  Indeed, SVP has a set of IT Policies which are specifically designed so that each SVP employee understands the information technology steps they are expected to take to preserve the integrity of SVP's Confidential Information, including its trade secrets.

21.     These trade secrets include the financial models by which SVP determines the commercial viability of Wireless Infrastructure projects; the financial models and documentation under which SVP finances its Wireless Infrastructure; the models that SVP uses to determine design and installation costs; the operational knowledge needed to maintain and upgrade this Wireless Infrastructure; the contractual provisions by which system upgrades are triggered under the customer agreements; the pre-negotiated wireless carrier capital support and associated terms

that SVP has negotiated with the wireless carriers; and SVP's list of both current and potential customers.

22.     In particular, SVP's financial models derive significant value from not being generally known as they utilize the following variables: annual foot traffic density, square footage, vertical type, building type, end use case, future system upgrade costs and timing projections, price per square foot system installation and system upgrade formulas, and interoperable systems integration, to run a complex equation which can model the value of a contract over the lifetime of the Wireless Infrastructure project.[1]  Indeed, given that these contracts may stretch over a decade or more, being able to accurately model long-term operating cost and profit is key to SVP's business.  It is this modeling which allows SVP to secure financing to proceed with the upfront cost of building the infrastructure which will then be recouped at a profit over the ten to twenty year lifecycle of the project.

23.     In addition to SVP's trade secrets associated with its comprehensive suite of Wireless Infrastructure offerings, SVP has also developed trade secrets related specifically to the following stand-alone offerings: public safety DAS systems, Wifi, RTLS, IPTV, Audio/Visual, and CBRS technologies.  These trade secrets include:  the models that SVP uses to determine the financial viability of a project, the models used to determine design and installation costs,[2] SVP's deployment models, design methodologies,  and permitting expertise on public safety DAS system integration, testing, and the governmental permit approval process.

---

[1] The data used in these models is typically itself confidential as the data is provided by the venue's owner pursuant to a confidentiality agreement or developed in confidence by SVP based on its prior experience in the industry.
[2] The variables used to determine design and installation costs include:  annual foot traffic density, square footage, vertical type, building type, end use case, future system upgrade costs and timing projections, and interoperable systems integration.

24.     SVP has also devoted thousands of hours to understanding the needs of its existing and potential customers (the needs of customers vary tremendously depending on where they are located and the type of wireless infrastructure needs they have).  The combination of the identity of those customers and their needs, which is specific and not widely known, constitute a valuable trade secret of SVP.

25.     SVP utilizes these trade secrets in the projects it has undertaken throughout North America.

**B. Braunschweig Joins SVP As A Senior Employee**

26.     In February 2019, Braunschweig was hired as SVP's sixth employee and Senior Vice President of Business Development, before being promoted to Chief Business Development Officer.  At the time she joined SVP, Braunschweig received a salary of $275,000 (the highest salary of any SVP employee at the time) along with significant commission opportunities, including a one percent (1%) commission on all systems SVP developed while Braunschweig was employed at SVP irrespective of whether or not Braunschweig directly originated the system opportunity.

27.     As Senior Vice President of Business Development and later Chief Business Development Officer, Braunschweig was responsible for the following key tasks at SVP: (1) cultivating relationships with SVP's potential clients; (2) understanding the needs of those clients; (3) developing a Wireless Infrastructure service proposal for those clients which would be profitable for SVP; (4) selling the client on that proposal; (5) negotiating the final contract with the client; (6) selecting vendors and contractors who could implement the contract; (7) managing the construction and integration process and selecting vendors and contractors for the system's installation and optimization, (8) managing wireless carrier coordination and onboarding, (9)

7

selecting the vendors and contractors that would provide 24/7/365 Monitoring & Maintenance for the system once operational, and (9) maintaining the customer relationship throughout the duration of their contract with SVP.

28.     To perform these tasks, Braunschweig required and had access to SVP's most valuable Confidential Information and the trade secrets described above including, but not limited to, design and installation cost modeling, client leads, financial performance models, vendor contact information, customer contracts, contractor agreements, and the documents and materials needed to obtain financing for Wireless Infrastructure projects.  Braunschweig was one of a limited number of SVP employees who had access to most of the above information, as such access was limited to SVP's senior management and members of SVP's finance team.

**C.  Braunschweig's Obligations to SVP**

29.     On February 21, 2019, SVP and Braunschweig entered into an Employment Agreement, a true and correct copy of which is attached as Exhibit A.

30.     As a condition of her employment, Braunschweig agreed to the following obligations to SVP.

31.     Braunschweig agreed in Section 3 of her Employment Agreement that "while employed by SVP, Employee will devote substantially all of her working time, labor, skills and energies to the business and affairs of the Firm.  Employee will not accept outside employment, whether as an employee or independent contractor, without the express written consent of SVP."

32.     Braunschweig agreed in Section 11 of her Employment Agreement that:

In view of your importance to the Firm, and your access to the Firm's confidential information and trade secrets, you hereby agree that the Firm would suffer significant harm from your competing with the Firm for some period of time after your employment ends. Accordingly, you hereby agree that you will not, without the written consent of the Firm, during your Employment Period and for a period of six (6) months after your date of termination own, manage, operate, or participate in the ownership, management, operation, or control of, provide services to, or be

employed by, any Competitive Enterprise[3] where you would hold a position with responsibilities that are entirely or substantially similar to the responsibilities of any position that you held during the last twelve (12) months of your employment or affiliation with the Firm, or (b) have responsibility for or access to confidential information that is similar to or that could be further developed using that Confidential Information which you had access to during the last twelve (12) months of your employment or affiliation with the Firm, or (c) be required to apply the same or similar specialized knowledge or skills as those utilized by you in your activities with the Firm in originating, obtaining or managing wireless infrastructure assets or providing wireless infrastructure services. Upon the date of termination, the Firm may choose to have Employee subject to this non-competition section for up to six (6) months. In no event shall the Employee be subject to this non-competition section for longer than six months from the date of her notice of termination. If the Firm does not inform Employee upon the date of her termination whether he or she is subject to this non-competition section or if the Firm fails to pay Employee hereunder, then the Firm shall release Employee from this section and any and all non-compete restrictions.

Exhibit A (Employment Agreement).

33.     Braunschweig also agreed that for a period of 12 months she would not Solicit[4] a Client[5] to do business with another entity or interfere with any relationship between SVP and its clients.  Ex. A (Employment Agreement) ¶ 12(a).

34.     Under Section 24 of the Employment Agreement, the restrictive covenants that bind Braunschweig "shall be extended by any period or periods during which [she is] in violation of such section."  Ex. A (Employment Agreement).

---

[3] "'Competitive Enterprise' means any person engaged in, attempting to engage in, or otherwise developing a strategy to engage in designing, building, financing or operating (other than use solely as a customer) single- or multi-carrier and/or multi-technology distributed networks to provide telecommunication services in North America, including, but not limited to, distributed antenna systems, distributed network systems, wireless service provider infrastructure, or any other business in which the Firm or any of its subsidiaries or affiliates is engaged in as of the applicable date of determination or in which they have actively and in writing planned, on or prior to such date, to be engaged in on or after such date."  Ex. A (Employment Agreement) ¶ 36.

[4] "'Solicit' means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action."  Ex. A (Employment Agreement) ¶ 36.

[5] "'Client' means any client or prospective client of the Firm to whom you provided services, or for whom you transacted business, or whose identity became known to you in connection with your relationship with or employment by the Firm."  Ex. A (Employment Agreement) ¶ 36.

35.     Braunschweig also acknowledged that during the course of her employment she would be (and in fact was) given access to SVP's Confidential Information[6] (which she would otherwise not have access to), she could only use SVP's Confidential Information as required to perform her work at SVP, and she was not permitted to disclose such Confidential Information to anyone who did not have a need to know.  Ex. A (Employment Agreement) ¶ 9.

36.     Likewise, SVP's Employee Handbook which Braunschweig signed and acknowledged on November 23, 2020 states that:

> Your employment with Strategic Venue Partners assumes an obligation to maintain confidentiality during and after you leave our employ.
>
> Our venue customers entrust Strategic Venue Partners with important information relating to their businesses, and the nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, Strategic Venue Partners earns the respect and future trust of our venue customers.
>
> Any violation of confidentiality seriously injures Strategic Venue Partners reputation and effectiveness.  You are not to discuss Strategic Venue Partners business with anyone who is not employed with Strategic Venue Partners, and never discuss business transactions with anyone who does not have association with the transaction.  Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to maintain confidentiality.  No one is permitted to remove or make copies of any Strategic Venue Partners records, reports, or documents without prior management approval.  There are no exceptions to this policy.

37.     The Employment Agreement also contains an arbitration clause covering "any dispute under this Agreement involving its interpretation or the obligations of a party hereto or relating to the performance of a party hereto."  Ex. A (Employment Agreement) ¶ 20.  However, the Employment Agreement permits SVP to seek injunctive relief in any court in Florida for any

---

[6] "Confidential Information" means "the Firm's trade secrets as defined under applicable law, as well as other information or material which is not generally known to the public and which: (a) is generated, collected by or utilized in the operations of the Firm's business and relates to the actual or anticipated business, research or development of the Firm; or (b) is suggested by or results from any task assigned to you by the Firm or work performed by you for or on behalf of the Firm."  Ex. A (Employment Agreement) ¶ 9.

actual or threatened breach of Braunschweig's restrictive covenants or confidentiality obligations. Ex. A (Employment Agreement) ¶¶ 21, 26.

**D. SVP Investigates Braunschweig's For Breach Of Her Obligations To SVP**

38.     In the spring of 2023, SVP became aware of suspicions that Braunschweig may be operating a business in competition with SVP.

39.     Given Braunschweig's senior position at SVP, the trust placed in her by SVP, and that Braunschweig initially denied that she was involved in any entities whose interests diverged from those of SVP, SVP hired an outside law firm to investigate these allegations.

40.     SVP's investigation into Braunschweig included a review of her SVP email, reviewing all corporate entities associated with her, and other investigative steps to seek to gain an understand of the businesses that Braunschweig was operating.

41.     SVP's knowledge of the conduct below is driven by the investigative steps outlined above.

**V.     BRAUNSCHWEIG BREACHES HER OBLIGATIONS TO SVP SHORTLY AFTER BEING HIRED BY SVP**

**A. Braunschweig Establishes And Solicits Business For Resolution Wireless, A Competitive Entity**

42.     Less than a year into her employment at SVP, and unbeknownst to SVP, Braunschweig established a new entity to directly compete with SVP.

43.     In particular, on November 25, 2019, Braunschweig along with Eric Eife, an individual whose LinkedIn profile notes his extensive experience in the Telecom industry and establishing new enterprises, established Resolution Wireless LLC ("Resolution Wireless").  Eife serves as Chief Operating Officer of Resolution Wireless.

44.     In the LLC Agreement, Braunschweig is listed as an individual authorized to manage Resolution Wireless, and the address provided by Braunschweig matches one of her

previous known personal residences.

45.     Further, Braunschweig maintains a LinkedIn profile which notes she is Chief Executive Officer of Resolution Wireless.  Braunschweig also maintains a separate LinkedIn profile which notes she is a Wireless Telecom Executive, and she uses this LinkedIn profile to connect with her colleagues at SVP.

46.     Resolution Wireless's website notes that it provides the following services:

- Wireless-as-a-Service – "Wireless-as-a-Service offers turnkey internet access solutions to businesses and buildings of all sizes. It allows property managers and business owners to scale their wireless systems as needed quickly."
- ERRCS (Emergency Responder Radio Coverage Systems) – allows first responders to clearly communicate over the radio within a building.
- Public Safety DAS – uses a DAS system to allow first responders to communicate within a building.
- Small Cell Solutions – "enable organizations to provide enhanced network coverage and capacity indoors and in difficult-to-cover outdoor areas."
- Capex to Opex – Resolution Wireless would provide the capital expenditure to install Wireless Infrastructure and the customer would pay for the service over time as an operating expense.
- Rooftop Management – marketing and negotiating with the wireless carriers to utilize rooftop space for macro cellular coverage in return for a long term lease.[7]

47.     Based on the services Resolution Wireless provides, it meets multiple criteria to qualify as a Competitive Enterprise under the terms of Braunschweig's Employment Agreement, including that it provides distributed antenna systems and wireless as a service, identical to SVP's principal offerings. Ex. A. (Employment Agreement) ¶ 36.  More specifically, SVP offers wireless as a service, a standalone Public Safety DAS, and rooftop management.

48.     Resolution Wireless has been an active competitor to SVP since it was founded in November 2019, and Braunschweig has directed such competitive efforts.  Below are examples of

---

[7] By comparison, the SVP website also identifies among its key wireless services "turnkey" lifecycle management, DAS, Public Safety systems, and Capex to Opex, among other wireless solutions.

opportunities Resolution Wireless has pursued in competition with SVP and Braunschweig's involvement in those opportunities.

49.     In a project tracker dated September 18, 2020, Braunschweig listed three projects (Niche Apartments, Integra Space Coast and Integra Crossings) that Resolution Wireless was working on alongside tracking the multiple other projects she was pursuing on behalf of SVP.

50.     On October 9, 2020, Resolution Wireless, with the client contact listed as Darlene Braunschweig, received a proposal from RK Squared, for the procurement of materials, installation, and commissioning of a 700/800MHz Public Safety DAS at Integra Trails (an apartment complex).

51.     On March 1, 2021, Braunschweig received an invoice from Notora, an engineering firm specializing in wireless networks, at her SVP email address but addressed to Resolution Wireless relating to work that Notora and Resolution Wireless were doing at Integra Crossings, a luxury appointment complex.

52.     Notora also provided services to Resolution Wireless for additional competitive projects including Nashville Highlands, an apartment complex, River Run, an apartment complex, and Monarch Town Center, a shopping mall in Miramar, Florida.

53.     With respect to River Run, in April 2021, Resolution Wireless registered a signal booster with the Federal Communications Commission for River Run Apartments in Orlando, Florida.

54.     On March 3, 2022, Braunschweig forwarded an email from Cy Caine, regarding a Condominium project in Fort Lauderdale, to Eric Eife at Resolution Wireless and asks, "this is the opp we were discussing right?"

55.     Finally, on February 24, 2023, Eife and Braunschweig were on an email chain with

Holston Development Group regarding Resolution Wireless's "DAS Capabilities."

56.     While the above examples are more than sufficient to illustrate that Braunschweig has been actively competing against SVP, out of an abundance of caution, SVP also arranged for individuals to reach out to confirm Braunschweig's involvement in Resolution Wireless at the present.

57.     In June 2023, when an individual reached out to Braunschweig at her Resolution Wireless email address to discuss wireless infrastructure for a condo building in Florida, Braunschweig responded by providing the cell phone number she used for SVP business to discuss the proposed opportunity.

58.     Likewise, in June 2023, an individual reached out to Eric Eife (Resolution Wireless's COO) to discuss "ballpark costs for wifi services, a first responder/life safety system, and an indoor cellphone coverage network" for a 610,000 square foot building.  Eife responded that Resolution Wireless "ha[d] done many systems like this" and copied Braunschweig on his response.

59.     As shown above, it is clear that Braunschweig was actively competing against SVP and misappropriating the good will she developed on SVP's behalf to aid her competitive business until the end of her employment at SVP.

60.     Further, she shamelessly used SVP's Confidential Information to compete against it.  For example, in approximately Q4 2020 – Q1 2021 SVP developed a slide presentation to pitch customers on its public safety offerings.  Such presentation walked through the regulatory requirements regarding public safety communications and how a public safety DAS system can address those regulatory requirements.

61.     Brazenly, Braunschweig took SVP's presentation, and generated a substantially

similar Resolution Wireless presentation in February 2021, to solicit customers on Resolution Wireless's behalf.

62.     Of course, Braunschweig likely did not limit herself to simply using one SVP PowerPoint in aid of her competitive venture.  Because of the similarity between the work done by SVP and Resolution Wireless, as well as Plaintiff's similar position at both firms, Plaintiff's possession of the Confidential Information and trade secret materials would likely have resulted in their disclosure and/or use at Resolution Wireless.

63.     Further, the Confidential Information and trade secrets that Braunschweig had access to, in the possession of Resolution Wireless, would have given Resolution Wireless an unfair competitive advantage.

64.     Indeed, for three and a half years Braunschweig operated a business directly competing with SVP while having management-level access to SVP's trade secrets.

65.     It is unimaginable that an employee who felt comfortable operating a competitive enterprise while employed by SVP would not also utilize SVP's trade secrets in establishing and supporting Resolution Wireless.

66.     Further, Resolution Wireless's improper acquisition and use of SVP's trade secrets gave it a short cut to establishing a suite of products to quickly and readily compete with SVP.

67.     Thus, throughout her employment by SVP, Braunschweig likely misappropriated SVP's Confidential Information including that subset of SVP's Confidential Information which forms its trade secrets, to give Resolution Wireless an unfair competitive advantage over SVP.

**B.  Braunschweig Utilizes Resolution Wireless To Acquire An Additional Entity Which Further Breaches Her Obligations To SVP**

68.     On December 17, 2021, Braunschweig began the process, through her ownership in Resolution Wireless, of also acquiring an interest in Suncoast Power LLC ("Suncoast Power").

She completed this acquisition on January 3, 2022, when the operative agreement governing the ownership and management of Suncoast Power was amended to add Resolution Wireless as an authorized member.

69.     Suncoast Power is a commercial electric contractor which serves clients ranging from small apartment complexes to large industrial plants and other large commercial facilities. As relevant to this matter, Suncoast Power specializes in the installation of low voltage fiber and coax cable, which are an essential component of installing Wireless Infrastructure. In addition, Suncoast Power performs cellular DAS and public safety DAS system design work and maintenance work.  Indeed, Suncoast Power's website describes the comprehensive suite of tools it offers with respect to Public Safety DAS:



70.     Thus, Suncoast Power meets the definition of a Competitive Enterprise within the Employment Agreement as it is an enterprise which "designs," "builds[]," and "operate[s]"

Wireless Infrastructure, and Braunschweig was barred from any direct or indirect involvement with or ownership of Suncoast Power.[8]

71.     Yet in another flagrant breach of her obligations to SVP, once Braunschweig acquired an interest in Suncoast Power, she wasted no time in directing its operations.

72.     Indeed, in a March 2022 email to an individual associated with Suncoast Power, Braunschweig wrote "You can send the opp[ortunitie]s direct to me for a 1st pass and I will decide if [Suncoast Power] should bid or not in discussions with the greater team." This email establishes that not only was Suncoast Power an active entity, but also that Braunschweig was serving as the decision maker on which opportunities it would pursue. Braunschweig's son, Tyler Braunschweig, is employed by Suncoast providing Braunschweig another avenue of involvement with Suncoast Power.

73.     In directing Suncoast Power's operations, Braunschweig likely utilized SVP's trade secrets including those relating to the design and installation of Wireless Infrastructure.

74.     Indeed, in the spring of 2022, Suncoast Power accelerated its sales activities.

75.     On March 5, 2022, Cy Caine, an individual associated with Suncoast Power, sent an email from his Suncoast Power email address to a prospective client noting that he worked with Suncoast Power and that Suncoast Power wished to bid to provide both BDA (bi-directional amplifier) and DAS services along with other open low voltage projects to the client. On this email, Caine copied both Braunschweig and Eric Eife (her co-manager at Resolution Wireless) at his Resolution Wireless email address.

---

[8] Under her Employment Agreement, Braunschweig cannot "own, manage, operate, or participate in the ownership, management, operation, or control of, provide services to, or be employed by, any Competitive Enterprise." Ex. A ¶ 11.

76.     On March 7, 2022, Caine wrote to Zachary Tapley, a project executive at a construction firm, noting that he represented Suncoast Power, and also misrepresented that he spoke on behalf of SVP.  Caine was never employed by SVP and did not have authority to speak on its behalf.  He then asked for a meeting with Braunschweig.  Given that Caine was misrepresenting he spoke on behalf of SVP, this email illustrates how Braunschweig and her colleagues were using SVP's goodwill to arrange meetings with prospective clients for the purpose of promoting Suncoast Power.

77.     As a further example of this misappropriation of SVP's goodwill, on March 16, 2022, Caine sent an email to a prospective client of Suncoast Power noting that Braunschweig is a principal of Suncoast Power and "also works for" SVP where she "develops relationships and opportunities nation wide."

78.     Caine also frequently emailed Braunschweig regarding Suncoast Power bidding on various opportunities including: on March 15, 2022, an opportunity with the City of Boston, on March 24, 2022 an opportunity with Baptist Health, and on April 8, 2022 an opportunity with 1885 Centrepark Apartments.  In these emails, Caine did not copy anyone else at SVP and in the email regarding Centrepark he copied Eife, COO at Resolution Wireless.

79.     Further, on December 12, 2022, Andre Mohammed, with a Suncoast Power email address, emailed Braunschweig with a design PDF for the installations of Wireless Infrastructure at Cardinal Health.

80.     Finally, Suncoast Power was involved in installing Public Safety Wireless Infrastructure at Southcenter Mall and was actively involved with this project in June 2023.

81.     As shown above, Braunschweig's breached her non-competition obligation by her ownership and management of Suncoast Power.

## VI.  BRAUNSCHWEIG CONTINUES TO COMPETE,
## AND STEALS SVP'S CORPORATE OPPORTUNITIES

82.     While Braunschweig's conduct described above clearly violates both her common law and contractual obligations to SVP, her acceptance and performance of work in direct competition with SVP, on a project where she led SVP's bid, represents the height of her duplicity.

83.     In the spring and early summer of 2022, Braunschweig served as the SVP lead on a potential deal to provide Wireless Infrastructure to Fontainebleau Las Vegas.

84.     Fontainebleau Las Vegas is a multi-billion dollar hotel and casino development and presented a tremendous business opportunity for SVP.

85.     In her role as deal lead, Braunschweig was responsible for preparing a proposal to Fontainebleau for a comprehensive suite of Wireless Infrastructure products, including Public Safety DAS.  She was also responsible for pricing SVP's proposal to Fontainebleau and subsequent negotiations with Fontainebleau.

86.     SVP was a finalist to provide Wireless Infrastructure to Fontainebleau, but Fontainebleau ultimately awarded the contract to Extenet, one of SVP's largest nationwide competitors.

87.     Unbeknownst to SVP at the time, Braunschweig decided to personally offer her services, either directly to Fontainebleau or indirectly to a subcontractor working for Fontainebleau to oversee the installation of the Public Safety DAS System at Fontainebleau in coordination with contract awardee Extenet.

88.     SVP will rely on discovery to reveal whether Braunschweig agreed to provide Extenet or one of its subcontractors with Public Safety DAS expertise while at the same time she was nominally representing SVP in its pitch to be awarded the Fontainebleau contract, or whether Braunschweig negotiated her personal deal only after SVP lost the business opportunity.

89.     Regardless of the precise timing of Braunschweig's decision to enrich herself at SVP's expense, by June 2022, SVP's involvement with Fontainebleau was over, but Braunschweig's personal involvement in the project only increased.

90.     For example, on August 31, 2022, Braunschweig emailed Grant May, Clark County Fire Protection Engineer, stating "I am working with Fontainebleau on their Public Safety DAS System" and asked that he review information to ensure it complied with relevant public safety system requirements for Clark County, Nevada.

91.     Braunschweig also received invoices relating to testing the DAS system at Fontainebleau and communicated with her son, Tyler Braunschweig, regarding testing of the Wireless Infrastructure at Fontainebleau.

92.     Braunschweig's involvement at Fontainebleau continues to the present day as on August 14, 2023, results of a Fire Prevention Inspection conducted on August 14, 2023 at Fontainebleau for an Emergency Response Radio Coverage permit were sent to her attention.

93.     Beyond its involvement in initially pitching for the project, SVP has not had any involvement in the Fontainebleau project, nor has it received any revenue associated with any work performed on the project, including the ongoing work ostensibly performed by Braunschweig.

94.     Upon information and belief, Braunschweig used SVP's Confidential Information, and its trade secrets, related to pricing models and methodologies for public safety DAS in soliciting work personally at Fontainebleau.

## VII.   BRAUNSCHWEIG IS TERMINATED FOR CAUSE BY SVP AND REFUSES TO CEASE HER COMPETITIVE ACTIVITIES

95.     While SVP's investigation into the extent of Braunschweig's misconduct remains ongoing, by the middle of July it was clear to SVP that Braunschweig had acted against the interests of SVP by competing against it.

96.     Based on this finding, the Board of Directors of SVP determined that Braunschweig's conduct constituted cause to terminate her employment under the terms of her Employment Agreement particularly under Section 18(ii), (v), and (vi) of her Employment Agreement.[9]

97.     On July 20, 2023, SVP terminated Braunschweig's employment for cause.

98.     Pursuant to the terms of her Employment Agreement, upon her termination, SVP paid to Braunschweig all outstanding salary and commission owed, repurchased certain preferred stock units she held pursuant to the operative agreement, and has otherwise fully performed under the terms of the Employment Agreement.

99.     SVP informed Braunschweig that it was enforcing the terms of her restrictive covenants, including her non-competition obligation.

100.    Since terminating Braunschweig, SVP has become aware of multiple indicia that Braunschweig continues to compete:

- On July 26, 2023, SVP became aware of communications between Braunschweig and Flash Networks Group, Inc. (a company which provides mobile internet optimization and wireless system design work) which confirm that Braunschweig is still actively competing against SVP.
- On August 22, 2023, Braunschweig attempted to sign into her Docusign account associated with SVP, presumably seeking to further her private competitive enterprises.
- As discussed above, Braunschweig continues to be actively involved in Public Safety

---

[9] These provisions provide that Braunschweig's employment could be terminated for cause due to: (ii) "the Employee's commission of any act of fraud, or material embezzlement, theft, or dishonesty or intentional misappropriation of the property of" SVP; (v) the material breach of her Employment Agreement; and (vi) " any other willful misconduct or gross negligence in the performance of the Executive's duties to SVP."

DAS at Fontainebleau as a sub-contractor to SVP's competitor, Extenet.

- Finally, while Braunschweig claims to have dissociated from Resolution Wireless, the Florida Secretary of State website still lists her as a manager of Resolution Wireless.

101.    As a result, SVP was compelled to file the present suit.

## COUNT I

### DEFEND TRADE SECRETS ACT AGAINST ALL DEFENDANTS

102.    SVP incorporates the allegations of paragraphs 1 through 101 above as if fully set forth herein.

103.    SVP owns trade secrets which derive independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain value from their disclosure or use.

104.    SVP's trade secrets have direct applicability to the work of Resolution Wireless, where Braunschweig held a similar role to the one she held at SVP.  The nature of Resolution Wireless's business and Braunschweig's position as CEO of Resolution Wireless rendered the use or disclosure of SVP's trade secrets to be inevitable.

105.    SVP's trade secrets have direct applicability to the work of Suncoast Power, where Braunschweig actively served in a similar capacity to her role at SVP.  The nature of Suncoast Power's business and Braunschweig's position in directing the work of Suncoast Power rendered the use or disclosure of SVP's trade secrets inevitable.

106.    Braunschweig has, without authorization, improperly acquired, used or disclosed or threatened to use or disclose, SVP's trade secrets which relate to the unique needs of its current and potential customers, its financial models, and the design and installation of Wireless Infrastructure.  These materials constitute Trade Secrets, as that term is defined in the Defend Trade Secrets Act 18 U.S.C. § 1839(3).

107.     Indeed, SVP would not have permitted Braunschweig to acquire these trade secrets if it was aware that she was engaged in competitive businesses.  Further, at the time of her misappropriation of SVP's trade secrets, Braunschweig knew or had reason to know that such conduct was improper, as her conduct was expressly forbidden by SVP policies and the terms of the Employment Agreement.

108.     Braunschweig's conduct thus constitutes actual "misappropriation" and threatened future "misappropriation," as that term is defined by 18 U.S.C. § 1839(5).

109.     By virtue of Braunschweig's conduct, Resolution Wireless has improperly acquired, used or disclosed SVP's trade secrets which relate to the unique needs of its current and potential customers and its financial models.

110.     By virtue of Braunschweig's conduct, Suncoast Power has improperly acquired, used or disclosed SVP's trade secrets which relate to modeling the cost of the installation and design of Wireless Infrastructure projects.

111.     By virtue of Braunschweig's roles at both Resolution Wireless and Suncoast Power, both companies knew that the acquisition, use, and disclosure of SVP's trade secrets was contrary to Braunschweig's duty to maintain secrecy.

112.     Defendants' conduct was willful and malicious, has caused actual loss to SVP, and threatens additional and future loss to SVP if not enjoined by the Court, such loss includes Defendants' misappropriation of SVP's good will, trade secrets, confidential business information, and the diversion and solicitation of Wireless Infrastructure customers from SVP to Resolution Wireless.

113.     Defendants' conduct has caused SVP to incur costs, expenses and attorneys' fees in bringing this action, which are ongoing.

## COUNT II

### CONNECTICUT AND FLORIDA UNIFORM TRADE SECRETS ACTS AGAINST ALL DEFENDANTS

114.    SVP incorporates the allegations of paragraphs 1 through 113 above as if fully set forth herein.

115.    Defendants have, without authorization, acquired, used or disclosed or threatened to use or disclose, SVP's trade secrets which relate to the unique needs of its current and potential customers, its financial models, and modeling the cost of the design and installation of Wireless Infrastructure.   These materials constitute Trade Secrets, as that term is defined in the Florida and Connecticut Trade Secrets Act.

116.    As described above, Defendants' conduct constitutes actual "misappropriation" and threatened future "misappropriation," as that term is defined by Florida Statute § 688.002(2) and Conn. Gen. Stat. § 35-51.

117.    Defendants' conduct was willful and malicious, has caused actual loss to SVP, and threatens additional and future loss to SVP if not enjoined by the Court, such loss includes Defendants' misappropriation of SVP's good will, trade secrets, confidential business information, and the diversion and solicitation of Wireless Infrastructure customers from SVP to Resolution Wireless.

118.    Defendants conduct has caused SVP to incur costs, expenses and attorneys' fees in bringing this action, which are ongoing.

## COUNT III

### BREACH OF CONTRACT AGAINST BRAUNSCHWEIG

119.    SVP incorporates the allegations of paragraphs 1 through 118 above as if fully set forth herein.

120.    Braunschweig breached Section 3 of the Employment Agreement by working for both Wireless Resolution and Suncoast Power while employed by SVP.

121.    Braunschweig breached Section 11 (Non-Competition) of the Employment Agreement by owning and working on behalf of both Wireless Resolution and Suncoast Power which qualify as Competitive Enterprises under the terms of the Employment Agreement.

122.    Braunschweig's continued work on public safety DAS at Fontainebleau is an ongoing breach of her non-competition obligation.

123.    Upon information and belief, Braunschweig continues to work on multiple other projects where she and entities associated with her provide Wireless Infrastructure services, including public safety DAS, which constitutes a further ongoing breach of her non-competition obligation.

124.    The term of Braunschweig's non-competition obligation should be extended at least an additional twelve (12) months to account for the time during which she was in breach of such obligation while employed by SVP pursuant to Section 24 of the Employment Agreement.

125.    Braunschweig breached Section 9 of her Employment Agreement by using and disclosing SVP's Confidential Information for her own personal gain.

126.    Braunschweig's conduct has caused actual loss to SVP and threatens additional and future loss to SVP if not enjoined by the Court, such loss includes Braunschweig's misappropriation of SVP's good will, trade secrets, confidential business information, and the diversion and solicitation of Wireless Infrastructure customers from SVP to Resolution Wireless, Suncoast Power and Braunschweig personally.

127.    SVP has no adequate remedy at law to prohibit Braunschweig from directly competing with SVP in the Wireless Infrastructure industry.

128.    Because SVP cannot be adequately compensated monetarily as a matter of law, the Employment Agreement provides for injunctive relief and other equitable relief, including but not limited to temporary restraining orders, preliminary injunctions, and permanent injunctions. Exhibit A (Employment Agreement) ¶ 21.

129.    By signing the Employment Agreement, Braunschweig acknowledged and agreed to the remedies provided to SVP in the event of a breach.

130.    SVP has a legitimate business interest in prohibiting Braunschweig from directly competing with it in the Wireless Infrastructure industry.

131.    Braunschweig's conduct has caused SVP to incur costs, expenses, and attorney's fees in bringing this action, which are ongoing.

## COUNT IV

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST BRAUNSCHWEIG

132.    SVP incorporates the allegations of paragraphs 1 through 131 above as if fully set forth herein.

133.    The Employment Agreement is a valid and binding contract between SVP and Braunschweig, and is supported by valid consideration by both sides.

134.    SVP reasonably expected and anticipated that Braunschweig would use SVP's Confidential Information for the purpose of performing her obligations toward SVP under the terms of her Employment Agreement while employed by SVP.

135.    SVP reasonably expected and anticipated that Braunschweig would not use the Confidential Information in a manner designed to harm SVP or with reckless disregard for the interests of SVP either while employed by the SVP or anytime thereafter.

136.    Braunschweig frustrated SVP's rights to the benefits of the Employment

Agreement by utilizing her access to the Confidential Information to impair the ability of SVP to compete in its industry.

137.    Braunschweig frustrated SVP's rights to the benefits of the Employment Agreement by competing with SVP for the majority of the time she was an employee.

### COUNT V

### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY AGAINST BRAUNSCHWEIG, RESOLUTION WIRELESS AND SUNCOAST POWER

138.    SVP incorporates the allegations of paragraphs 1 through 137 above as if fully set forth herein.

139.    Braunschweig, Suncoast Power and Resolution Wireless had knowledge of SVP's advantageous business relationships with current and prospective customers.

140.    Braunschweig, Suncoast Power and Resolution Wireless have knowingly, intentionally and without justification interfered with or attempted to interfere with SVP's business relationships with its customers or potential customers.

141.    Namely, Braunschweig, Suncoast Power and Resolution Wireless knew that many of the projects they pursued were projects that Braunschweig could have pursued on behalf of SVP.

142.    As a result of Braunschweig, Suncoast Power and Resolution Wireless's actions, SVP has suffered a loss in the form of lost business opportunities.

143.    Defendants' conduct was wanton, willful and malicious.

### COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACT AGAINST RESOLUTION WIRELESS AND SUNCOAST POWER

144.    SVP incorporates the allegations of paragraphs 1 through 143 above as if fully set

forth herein.

145.    The Employment Agreement between Braunschweig and SVP is a valid and binding contract.

146.    Suncoast Power and Resolution Wireless were aware of such Employment Agreement by virtue of Braunschweig's roles in these entities.

147.    By having Braunschweig own and operate Suncoast Power and Resolution Wireless, Suncoast Power and Resolution Wireless intended for Braunschweig to breach her contractual obligations to SVP including her obligations not to compete and to devote her full energy to working on behalf of SVP.

148.    Resolution Wireless and Suncoast Power's efforts were wrongful as they deprived SVP of the benefit of its bargain with Braunschweig and allowed Suncoast Power and Resolution Wireless to unjustly benefit from SVP's confidential information and the goodwill it established with customers.

149.    SVP has suffered a loss as a result of Resolution Wireless and Suncoast Power's actions as it was deprived of the benefit of its bargain with Braunschweig and these entities misappropriated SVP's goodwill, confidential information and goodwill.

## COUNT VII

## BREACH OF DUTY OF LOYALTY AGAINST BRAUNSCHWEIG

150.    SVP incorporates the allegations of paragraphs 1 through 149 above as if fully set forth herein.

151.    Braunschweig owed a common law fiduciary duty of loyalty to SVP, separate and distinct from her contractual duties under the Employment Agreement, based upon, inter alia, the special confidence reposed in her by SVP.   At all times during her employment with SVP,

Braunschweig was obligated to act solely and exclusively in SVP's best interests, and was prohibited from acting in a manner contrary to SVP's legitimate business interests.

152.    Braunschweig breached this duty by, inter alia, unfairly competing with SVP, misappropriating trade secrets and misusing confidential information and documents, and thereby jeopardizing SVP's business.

153.    Braunschweig further breached this duty by using SVP's confidential information and documents for her own benefit, and thereby failed to use her best efforts to promote and serve SVP while employed.

## STATEMENT OF IRREPARABLE HARM

154.    SVP has been and continues to be subjected to irreparable injury for which no remedy at law exists.

155.    The unlawful actions of Defendants, their agents and those acting in concert with them, are causing and will continue to cause great and irreparable harm to SVP's business which cannot adequately be remedied by an award of monetary damages.

156.    Without this Court's intervention there is a real, present and continuing threat that Defendants will wrongfully use or disclose SVP's trade secrets and confidential or proprietary information in competition with SVP, and tortiously interfere with contractual and business relations of SVP.

157.    Defendants' use and/or disclosure of SVP's trade secrets and confidential and proprietary information would cause SVP irreparable harm for which SVP has no remedy at law.

158.    Unless a preliminary and/or permanent injunction is entered on the terms set forth below, greater injury will be inflicted on SVP than could possibly result to Defendants by the granting of said relief.  Defendants will be harmed by the granting of the prayed-for injunctive

relief only to the extent that the order will compel them to abide by their obligations imposed by law.

### STATEMENT OF PLAINTIFF'S LEGITIMATE PROTECTIBLE BUSINESS INTERESTS AND NECESSITY OF RESTRICTIONS TO PROTECT THESE INTERESTS

159.    SVP has a legitimate and protectible business interest in (i) its trade secrets, (ii) its valuable confidential business information, (iii) its substantial relationships with customers and vendors, (iv) customer, and employee and business practice goodwill, and/or (v) the substantial sums it invested in allowing Braunschweig to build customer relations as its Chief Business Development Officer.

### PRAYER FOR INJUNCTIVE RELIEF

**WHEREFORE**, Plaintiff SVP prays:

160.    That judgment be entered in favor of SVP and against Defendants;

161.    That judgment be entered declaring that the actions of Defendants are in breach of contract and violation of state and federal statutory and common law;

162.    That Braunschweig, Resolution Wireless and Suncoast Power be preliminarily and permanently enjoined from the actions described herein consistent with the law, including but not limited to:

a.    requiring Defendants to inventory and immediately return, without retaining any copies or summaries, all of SVP's documents and information within their possession, custody or control which constitute SVP's trade secrets and/or Confidential Information, and precluding Defendants from using or disclosing any of SVP's confidential or proprietary documents or information or trade secrets;

b.    enjoin and restrain Braunschweig, her agents, servants, employees, attorneys and all others in active concert or participation with her who receive

actual notice thereof by personal services or otherwise, for a period of eighteen (18) months from the date of the Court's Order, from directly or indirectly competing with SVP by holding any role with a Competitive Enterprise as that term is defined in her Employment Agreement;

c.      ordering that Braunschweig completely divest of any interest in Resolution Wireless and Suncoast Power within fourteen (14) days from the date of the Court's Order and that such divesture shall not include retaining any economic interest or repurchase right in Resolution Wireless or Suncoast Power;

d.      ordering that the proceeds of such divestiture be placed in a constructive trust for the benefit of SVP;

e.      enjoin and restrain Resolution Wireless and Suncoast Power from any association, directly or indirectly, with Braunschweig for a period of eighteen (18) months from the date of the Court's Order;

f.      enjoin and restrain Defendants, their agents, servants, employees, attorneys and all others in active concert or participation with them who receive actual notice thereof by personal services or otherwise, for a period of eighteen (18) months from the date of the Court's Order, from directly or indirectly soliciting and diverting SVP customers to whom Braunschweig provided services, or for whom Braunschweig transacted business, or whose identity became known to Braunschweig in connection with her relationship with or employment by SVP (the "Prohibited Customers");

g.      precluding Defendants and anyone to whom they disclosed or conveyed confidential information relating to SVP or its customers from having any further

contact, directly or indirectly, with the Prohibited Customers, for a period of eighteen (18) months from the date of the Court's Order;

h.       precluding Defendants and anyone else to whom they disclosed or conveyed confidential information relating to SVP or its customers from having any communications with, or providing any assistance or information to, directly or indirectly, anyone who has any responsibility for any Prohibited Customers, for a period of eighteen (18) months from the date of the Court's Order;

163.    SVP further prays that Defendants be duly cited to appear and answer this Complaint, after having been served with a copy of same, and that after due proceedings had, there be judgment herein in favor of SVP and against Defendants granting a permanent injunction in the form and substance of the preliminary injunction prayed for by SVP, and compelling any further disputes between SVP and Braunschweig to arbitration.  In such arbitration, SVP seeks to recover monetary damages, punitive damages, attorneys' fees, costs and prejudgment interest.

### PRAYER FOR DAMAGES AND SUCH OTHER RELIEF

164.    Plaintiff SVP further prays for:

a.       all damages sustained by it as a result of the wrongful conduct described above, beginning with the earliest date of violation up until the date of the entry of the final judgment in this action;

b.       pre- and post-judgment interest;

c.       attorneys' fees and costs;

d.       punitive damages; and

e.       such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

165.     Plaintiff demands a jury trial as to all issues so triable.


Dated:  August 25, 2023

MORGAN, LEWIS & BOCKIUS LLP


*/s/ Kimberley E. Lunetta*
Kimberley E. Lunetta
Florida Bar No. 1026812
Email: kimberley.lunetta@morganlewis.com
Morgan, Lewis & Bockius LLP
600 Brickell Avenue
Suite 1600
Miami, FL 33131-3075
Telephone: 305.415.3000
eFacsimile: 877.432.3001

Melissa D. Hill *(pro hac forthcoming)*
Email: melissa.hill@morganlewis.com
Lucas D. Hakkenberg *(pro hac forthcoming)*
Email:  lucas.hakkenberg@morganlewis.com
101 Park Avenue
New York, New York 10178
Telephone: 212.309.6000
Facsimile: 212.309.6001

*Attorneys for Plaintiff*

## VERIFICATION

In accordance with 28 U.S.C. § 1746, I Justin Marron, Chief Executive Officer of Plaintiff Strategic Venue Partners, LLC, declare, under penalty of perjury, that I have read and reviewed the foregoing Verified Complaint and state that the facts alleged therein are true and accurate to the best of my knowledge, information, and belief.

Dated: August 25, 2023

Justin Marron

1